# IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| CHRISTOPHER ORLANDO AND YESSENIA STAR ACOSTA, <br><br> Plaintiffs, <br><br> v. <br><br> EQUIFAX INFORMATION SERVICES, LLC, EXPERIAN INFORMATION SOLUTIONS, INC., TRANS UNION LLC, AND HYUNDAI CAPITAL AMERICA, INC. F/K/A HYUNDAI MOTOR FINANCE COMPANY, <br><br> Defendants. | Case No. 3:26-cv-00010 <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Christopher Orlando ("Plaintiff Orlando") and Yessenia Star Acosta ("Plaintiff Acosta") ("collectively, "Plaintiffs"), by and through the undersigned counsel, bring this action on an individual basis, against Equifax Information Services, LLC ("Equifax"); Experian Information Solutions, Inc. ("Experian"); Trans Union LLC ("Trans Union") (collectively, the "Credit Bureau Defendants"); and Hyundai Capital America, Inc. f/k/a Hyundai Motor Finance Company ("HCA"); (all defendants collectively, "Defendants"), and states as follows:

## INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to

requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.     However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.     These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.     One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.     The FCRA also requires furnishers of information, a creditor or other third party

that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11. Plaintiffs' claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein the Credit Bureau Defendants reported to Plaintiffs' potential creditors that Plaintiff had failed to make timely payment on their Hyundai Motor Finance auto lease account and that the account had been charged off with a past-due balance. These reports falsely reflected 30-day and 60-day delinquencies for March and April 2023, and a charge-off in May 2023, despite the fact that the vehicle had been declared a total loss on December 22, 2022 and the lease account was fully paid and closed by January 20, 2023 following Liberty Mutual's total-loss settlement to HCA.

12. Accordingly, Plaintiffs bring claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs' credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and for failing to conduct a reasonable reinvestigation to determine whether information Plaintiffs disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13. Plaintiffs also bring claims against Defendant HCA for failing to fully and properly reinvestigate Plaintiffs' disputes and review all relevant information provided by Plaintiffs and the Credit Bureau Defendants, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

14. As part of this action, Plaintiffs seeks actual, statutory, and punitive damages, costs

4

and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

15. Christopher Orlando ("Plaintiff Orlando" or "Mr. Orlando") is a natural person residing in Charlotte, North Carolina, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16. Yessenia Star Acosta ("Plaintiff Acosta" or "Ms. Acosta") is a natural person residing in Charlotte, North Carolina, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

17. Defendant Equifax Information Services, LLC. ("Defendant Equifax" or "Equifax") is a consumer reporting agency that maintains its principal place of business at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309.

18. Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a consumer reporting agency that maintains its principal place of business at 475 Anton Boulevard, Costa Mesa, California 92626.

19. Defendant Trans Union LLC ("Defendant Trans Union" or "Trans Union is a consumer reporting agency that maintains its principal place of business at 555 West Adams Street, Chicago, Illinois 60661.

20. Defendant Hyundai Capital America, Inc. f/k/a Hyundai Motor Finance Company ("Defendant HCA" and "HCA") is a California corporation with its principal address in 3161 Michelson Dr., Ste 1900, Irvine, California 92612, and is authorized to do business in the State of North Carolina, including within this District. HCA can be served through its registered agent National Registered Agents, Inc. at 160 Mine Lake Ct Ste 200, Raleigh, NC 27615.

21. HCA is a credit grantor and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

<u>**JURISDICTION AND VENUE**</u>

22. Jurisdiction of this Court arises under 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

23. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events giving rise to the claim occurred within the jurisdictional confines of the Western District of North Carolina.

<u>**FACTS**</u>

**Plaintiffs Enter into Auto Lease and Maintain Timely Payments**

24. In July 2020, Plaintiffs entered into a motor-vehicle lease agreement with Defendant HCA for a Hyundai Sonata.

25. Plaintiff Orlando was the primary lessee, and Plaintiff Acosta was the co-signer. Under the lease, HCA remained the titled owner, and Plaintiffs were responsible for making monthly payments and maintaining insurance coverage listing HCA as the loss payee.

26. From the inception of the lease in 2020 through December 2022, Plaintiffs consistently made timely monthly payments of approximately $415.74, as reflected in HCA's own payment history.

**Plaintiffs' Vehicle was Declared a Total Loss, and the Account was Fully Paid**

27. On or about December 22, 2022, Plaintiffs' vehicle was involved in an accident and declared a total loss by their insurance carrier, Liberty Mutual Insurance Company ("Liberty").

28. On or about January 10, 2023, HCA issued a Letter of Guarantee to Liberty Mutual stating that upon receipt of $20,872.76, HCA would release and transfer all of its rights, title, and interest in the vehicle to Liberty.

29. Shortly thereafter, Liberty issued payment in the amount of $20,872.76 directly to

6

HCA, which was processed and cleared on January 20, 2023, thereby fully satisfying the lease account.

30.     Liberty's total-loss payment included an additional $5,318.64 issued to Plaintiff Orlando as the residual portion of the settlement, representing the full insured value of the vehicle after application of the deductible, taxes, and fees.

31.     Subsequently, on or about January 26, 2023, HCA issued a written notice to Plaintiff Orlando titled "Remaining Balance Letter."

32.     In the Remaining Balance Letter, HCA expressly stated that *"all funds received from your total-loss claim have been applied to your account,"* but it simultaneously and inconsistently alleged that a "Primary Insurance Deductible" of $500.00 remained due, while assigning $0.00 to every other category including "Insurance Deficiency," "Unpaid Lease Payments," and "Accrued Property Tax."

33.     Plaintiff Orlando was confused and alarmed upon receiving this letter, as he was under the clear and reasonable impression that the total-loss payment from Liberty had completely satisfied all lease obligations owed to HCA.

**Plaintiff Orlando Contacts Defendant HCA Regarding the Alleged Balance**

34.     Concerned about the letter's contradictory contents, Plaintiff Orlando promptly contacted Defendant HCA on multiple occasions from 2024-2025 to obtain clarification and to understand the basis of the alleged $500 balance.

35.     During these communications, HCA's representatives were unable to provide a consistent or coherent explanation for the alleged balance. Instead, HCA issued contradictory statements and conflicting account records, which only deepened Plaintiff's confusion and demonstrated HCA's lack of reliability to verify its account data.

7

36.     In response to Plaintiffs' request for supporting documentation, HCA provided an account payment history purporting to reflect all transactions on the lease account. The record accurately reflected Plaintiffs' regular monthly payments through December 2022, but then inexplicably included two additional transactions, one for $62.34 and another for $21,140.64, both dated December 6, 2022.

37.     These figures bore no connection to the $20,872.76 payoff amount reflected in HCA's own Letter of Guarantee to Liberty, nor did HCA's representatives offer any accounting, reconciliation, or reasonable explanation for the discrepancy.

**Plaintiffs Contact Liberty Mutual Insurance Company**

38.     Troubled by HCA's conflicting correspondence and its baseless assertion of a $500 "Primary Insurance Deductible" balance, Plaintiff Orlando immediately contacted his insurer, Liberty, to obtain clarification regarding the total-loss payment and the status of the HCA account.

39.     Plaintiff Orlando informed Liberty that Defendant HCA was continuing to assert a remaining balance even after acknowledging receipt of insurance proceeds and that the account statements HCA provided contained unexplained, inconsistent, and mathematically irreconcilable entries.

40.     Plaintiff sought verification of whether Liberty's total-loss payment had in fact extinguished the lease obligation in full.

41.     After reviewing its claim file, Liberty confirmed that all funds due under the total-loss settlement had been fully paid, applied, and cleared in January 2023.

42.     Specifically, Liberty verified that the lienholder payment of $20,872.76 was remitted to HCA on January 10, 2023, and cleared by HCA on January 20, 2023, thereby satisfying HCA's entire interest in the vehicle.

43.     Liberty further confirmed that, in addition to the lienholder payment, a separate check in the amount of $5,318.64 was issued to Plaintiff Orlando as the residual portion of the settlement, representing the insured's remaining equity after the total-loss valuation and deductible were applied.

44.     During this review, Liberty discovered that, on March 1, 2023, nearly two months after the claim had been fully settled and paid, HCA improperly submitted a "revised amount" request for $25,355 (another number inconsistent with the $500 balance HCA alleges remains), attempting to reopen a closed loss file. Liberty formally denied that request as unauthorized and unsupported, confirming that all payments under the policy had been completed in January 2023 and that no additional amounts were owed.

45.     On June 18, 2025, Liberty Mutual issued a written confirmation letter memorializing its findings and correspondence with HCA.

**Defendants Report that Plaintiffs Were Delinquent on One or More Payment Obligations**

46.     Worried about the implications of the HCA account on their credit standing, Plaintiffs each requested copies of their credit reports from the Credit Bureau Defendants to confirm the accuracy of the information being reported.

47.     Plaintiff Orlando obtained his credit reports from Experian and Trans Union on May 23, 2025, and from Equifax on May 22, 2025.

48.     Each report contained the same Hyundai Motor Finance / Hyundai Capital America account (No. 2014598194), inaccurately listed as an "Auto Lease - Charged Off." The reports falsely reflected a past-due balance of $604, a charge-off amount of $1,127, and 30-day and 60-day delinquencies for March and April 2023 (the "Inaccurate Derogatory Information").

49.     Plaintiff Acosta subsequently obtained her own credit reports from Experian, Equifax, and Trans Union on May 31, 2025.

9

50.     Her reports mirrored the same inaccurate Hyundai Motor Finance / Hyundai Capital America account (No. 2014598194), with identical false data.

51.     Upon information and belief, Defendant HCA reported the Inaccurate Derogatory Information to the Credit Bureau Defendants.

52.     These delinquency and charge-off notations were false and unsupported, as the account had been paid in full and closed as of January 20, 2023, following Liberty's lienholder payment of $20,872.76 to HCA Exchange, Inc., which extinguished all remaining obligations under the lease.

53.     Despite this, the Credit Bureau Defendants published HCA's Inaccurate Derogatory Information on Plaintiffs' credit files, displaying March and April 2023 delinquencies, followed by a charge-off status from May 2023 onward, with a $604 past-due balance and $1,127 charge-off amount that appeared on all three of Plaintiffs' credit reports.

54.     Plaintiffs were confused and distressed by this information, as they had never missed a payment and were under the clear and reasonable understanding, supported by documentation from Liberty that their Hyundai lease had been satisfied in full months before the alleged delinquencies.

**Plaintiffs Dispute to Defendants Regarding the Inaccurate Derogatory Information**

55.     Concerned that Defendant HCA's false charge-off and delinquency reporting would continue to damage their credit standing, Plaintiffs each submitted written disputes to Experian, Equifax, and Trans Union between July 8, 2025, and August 6, 2025.

56.     In their disputes, Plaintiffs provided extensive documentation demonstrating that the Hyundai Motor Finance / Hyundai Capital America account No. 2014598194 had been paid in full and closed in January 2023, following Liberty's lienholder payment of $20,872.76 to HCA.

57. Plaintiffs requested that Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and to send them each a corrected copy of their consumer reports.

**Defendant Equifax's Unreasonable Dispute Reinvestigation**

58. Upon information and belief, Defendant Equifax received each Plaintiff's July 2025 dispute.

59. Upon information and belief, Equifax failed to send Defendant HCA an automated credit dispute verification ("ACDV") pursuant to Plaintiffs' July 2025 dispute to Equifax.

60. Despite receiving Plaintiffs' detailed disputes and supporting documentation, Defendant Equifax failed to acknowledge receipt or issue any written results of its reinvestigation.

61. Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiffs in support of Plaintiffs' dispute.

62. Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiffs' July 2025 dispute.

63. Thereafter, Defendant Equifax failed to correct or delete the inaccurate charge-off status, past-due notations, and balance appearing in both Plaintiffs' credit files, which continued to misrepresent a fully paid and closed Hyundai lease account as delinquent and charged off.

64. Equifax failed to conduct a reasonable reinvestigation of Plaintiffs' dispute tendered July 2025, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Experian's Unreasonable Dispute Reinvestigation**

65. Upon information and belief, Defendant Experian received both Plaintiffs' July 2025 disputes.

66. Upon information and belief, Experian sent Defendant HCA an automated credit dispute verification ("ACDV") pursuant to Plaintiffs' July 2025 dispute to Experian.

67. However, despite receiving Plaintiff Orlando's detailed dispute and supporting documentation, Defendant Experian failed to acknowledge receipt or issue any written results of its reinvestigation in response to Plaintiff Orlando's dispute.

68. Conversely, on or about August 4, 2025, Defendant Experian issued written results of Plaintiff Acosta's dispute.

69. Experian's results stated, "The information you disputed has been verified as accurate; however, information unrelated to your dispute has been updated." The notation "Verified and Updated" appeared beside the Hyundai lease account, which remained reported as "Account charged off / Never late – $1,127 written off, $500 past due as of Aug 2025."

70. Such continued reporting was patently inaccurate, as Plaintiffs had already paid off the Hyundai lease in full in January 2023, confirmed by HCA's payoff acknowledgment and Liberty's insurance settlement correspondence.

71. Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Plaintiffs in support of their dispute.

72. Upon information and belief, Defendant Experian failed to conduct a reasonable reinvestigation of Plaintiffs' July 2025 dispute.

73. Thereafter, Defendant Experian failed to correct or delete the inaccurate charge-off status, past-due notations, and balance appearing in Plaintiffs' credit files, which continued to misrepresent a fully paid and closed Hyundai lease account as delinquent and charged off.

74. Experian failed to conduct a reasonable reinvestigation of Plaintiffs' disputes tendered July 2025, or any reinvestigation whatsoever, to determine whether the disputed

information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

75.     Upon information and belief, Defendant Trans Union received each Plaintiff's July 2025 dispute.

76.     Upon information and belief, Trans Union sent Defendant HCA an automated credit dispute verification ("ACDV") pursuant to Plaintiffs' July 2025 dispute to Trans Union.

77.     On or about August 6, 2025, Trans Union issued a Dispute Results letter to Plaintiff Orlando, stating that the "disputed information has been changed or updated."

78.     However, the account remained reported as charged-off with a $500 balance and past-due amount, with $1,127 written off.

79.     Furthermore, despite receiving Plaintiff Acosta's detailed written dispute with supporting documentation showing that the Hyundai lease account had been fully paid and closed as of January 2023, Defendant Trans Union failed to issue any written reinvestigation results or acknowledgment of the dispute.

80.     Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiffs in support of their disputes.

81.     Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiffs' July 2025 dispute.

82.     Thereafter, Defendant Trans Union failed to correct or delete the inaccurate charge-off status, past-due notations, and balance appearing in both Plaintiffs' credit files, which continued to misrepresent a fully paid and closed Hyundai lease account as delinquent and charged off.

83.     Trans Union failed to conduct a reasonable reinvestigation of both Plaintiffs'

dispute tendered July 2025, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendants' Method for Considering Consumer Credit Report Disputes**

84. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

85. The credit bureaus, Equifax, Experian, and Trans Union, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

86. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

87. It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

88. Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

89. Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

90. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

91. These ACDV "fields" have various titles for the many substantive areas into which

the Metro 2 codes can be entered.

92.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

93.    The data furnishers, like Defendant HCA, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

94.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Defendant HCA's Unreasonable Dispute Reinvestigation**

95.    Upon information and belief, in or around July 2025, Defendant HCA received Defendant Experian's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiffs.

96.    Upon information and belief, Defendant HCA failed to review all relevant information provided by Defendant Experian regarding Plaintiffs' dispute tendered in or around July 2025.

97.    Upon information and belief, Defendant HCA verified the disputed information as accurate to Defendant Experian in response to Plaintiffs' July 2025 dispute.

98.    Upon information and belief, in or around July 2025, Defendant HCA received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to

15

the information disputed by Plaintiffs.

99.    Upon information and belief, Defendant HCA failed to review all relevant information provided by Defendant Trans Union regarding Plaintiffs' disputes tendered in or around July 2025.

100.    Upon information and belief, Defendant HCA verified the disputed information as accurate to Defendant Trans Union in response to Plaintiffs' July 2025 dispute.

101.    Defendant HCA violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete, or unverifiable.

### Plaintiffs' Damages

102.    Plaintiffs reasonably believe that Defendant HCA continued to furnish the Inaccurate Derogatory Information to the CRAs, and the Credit Bureau Defendants continued to report such information about Plaintiffs.

103.    As a result of the Inaccurate Derogatory Information, the Defendants made it practically impossible for Plaintiffs to continue to obtain credit.

104.    On October 8, 2025, Plaintiff Orlando applied for a Capital One credit card and was denied. The Adverse Action Notice identified that Capital One had accessed his credit files from Experian, TransUnion, and Equifax.

105.    Upon information and belief, Capital One denied Plaintiff Orlando's application due to the continued presence of the Inaccurate Derogatory Information pertaining to the Hyundai lease account across all three Credit Bureau Defendants.

106.    Upon information and belief, the Credit Bureau Defendants inaccurately published

in the consumer report to Capital One that Plaintiff Orlando's Hyundai lease account was charged-off, included past due notations, and had a balance of at least $500.

107.    The Credit Bureau Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it maintained and published to Capital One concerning Plaintiff Orlando.

108.    Plaintiff Orlando suffered significant physical manifestations of emotional distress as a result of Defendants' inaccurate reporting. In June 2025, Plaintiff Orlando went to the emergency room believing he was suffering a heart attack, which medical professionals determined was stress-related high blood pressure.

109.    The continuing publication of the false late payments, charge-off status, and inaccurate balance has placed Plaintiff Orlando under constant fear of credit denials, higher interest rates, and further financial injuries. This fear continues today, as Defendants still have not corrected the inaccurate reporting.

110.    On October 8, 2025, Plaintiff Acosta applied for a Capital One credit card and was approved with an unusually high interest rate of 28.99%.

111.    Upon information and belief, Capital One had accessed her credit files from Experian, TransUnion, and Equifax.

112.    Upon information and belief, Plaintiff Acosta was approved at less favorable terms due to the continued presence of the Inaccurate Derogatory Information pertaining to the Hyundai lease account across all three Credit Bureau Defendants.

113.    Upon information and belief, the Credit Bureau Defendants inaccurately published in the consumer report to Capital One that Plaintiff Acosta's Hyundai lease account was charged-off, included past due notations, and had a balance of at least $500.

17

114.    The Credit Bureau Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it maintained and published to Capital One concerning Plaintiff Acosta.

115.    Furthermore, On October 31, 2025, Plaintiff Acosta applied for a credit limit increase on her Best Buy account and was denied. The Adverse Action Notice stated that Best Buy relied on a credit report obtained from Defendant Equifax.

116.    Upon information and belief, Best Buy denied Plaintiff Acosta's application due to the continued presence of the Inaccurate Derogatory Information pertaining to the Hyundai lease account on the consumer report Defendant Equifax sold to Best Buy.

117.    Upon information and belief, the Defendant Equifax inaccurately published in the consumer report to Best Buy that Plaintiffs' Hyundai lease account was charged-off, included past due notations, and had a balance of at least $500.

118.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it maintained and published to Best Buy concerning Plaintiff Acosta.

119.    The continuing publication of the false late payments, charge-off status, and inaccurate balance has placed Plaintiff Acosta under constant fear of credit denials, higher interest rates, and further financial injuries. This fear continues today, as Defendants still have not corrected the inaccurate reporting

120.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

121.    At all times pertinent hereto, the conduct of Defendants, as well as that of their

respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

122.    As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc*., 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

123.    Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendants' FCRA violations are willful.

124.    As a result of Defendants' conduct, action, and inaction, each Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from their good credit rating; detriment to their credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

**CLAIMS FOR RELIEF**

19

<div align="center">

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

</div>

125.    Plaintiffs re-allege and incorporate by reference the allegations set forth in preceding paragraphs as if fully stated herein.

126.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

127.    On at least one occasion during 2025, Defendants Equifax, Experian, and Trans Union prepared patently false consumer reports concerning Plaintiffs.

128.    Defendants Equifax, Experian, and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiffs and ultimately Plaintiffs' creditworthiness.

129.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning each Plaintiff.

130.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning each Plaintiff.

131.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning each Plaintiff.

<div align="center">

20

</div>

132. As a result of Credit Bureau Defendants' conduct, action, and inaction, each Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from their good credit rating; detriment to their credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

133. Defendants Equifax, Experian, and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

134. Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Defendants Equifax, Experian, and Trans Union)

135. Plaintiffs re-allege and incorporate by reference Paragraph Nos. 1-124 as if fully stated herein.

136. The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id*.

137. The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the

accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

138. On at least one occasion during 2025, Plaintiffs disputed the inaccurate information with Equifax, Experian, and Trans Union and requested that they correct and/or delete a specific item in their credit file that is patently inaccurate, misleading, and highly damaging to their, namely, the charged-off status, past-due notations, and balance reported about their Hyundai lease account.

139. In response to Plaintiff's dispute, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

140. In response to Plaintiff's dispute, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

141. In response to Plaintiff's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

142. The Credit Bureau Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

143. As a result of Credit Bureau Defendants' conduct, action, and inaction, each

Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from their good credit rating; detriment to their credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

144.    Defendants Equifax, Experian, and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

145.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

### COUNT III
### 15 U.S.C. § 1681s-2(b)
### Failure to Conduct an Investigation and Correct the Reporting
### (First Claim for Relief Against Defendant HCA)

146.    Plaintiffs re-allege and incorporate by reference Paragraph Nos. 1-124 as if fully stated herein.

147.    Defendant HCA furnished the inaccurate information relating to both Plaintiffs to the national credit bureaus, including, but not limited to, the Credit Bureau Defendants.

148.    Defendant HCA violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiffs' dispute, or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiffs to the Credit Bureau Defendants; and, by failing to

cease furnishing inaccurate information relating to Plaintiffs to the Credit Bureau Defendants.

149. As a result of Defendant HCA's conduct, action, and inaction, each Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from their good credit rating; detriment to their credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

150. Defendant HCA's conduct, action, and inaction were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiffs to recover under 15 U.S.C. § 1681o.

151. Plaintiffs are entitled to recover attorneys' fees and costs from Defendant HCA in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i. Determining that Defendants negligently and/or willfully violated the FCRA;

ii. Actual damages pursuant to 15 U.S.C. §§ 1681o and/or 1681n;

iii. Statutory damages pursuant to 15 U.S.C. §§ 1681o and/or 1681n;

iv. Punitive damages pursuant to 15 U.S.C. §1681n;

v. Awarding costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681o and/or 1681n; and,

vi. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiffs are entitled to and hereby demand a trial by jury on all issues so triable.


Dated: January 5, 2026

<div style="margin-left: 40%;">

*/s/ Carlos Randolph Emory*
Carlos Randolph Emory, Bar No. 17161
The Emory Law Firm, P.C.
11020 David Taylor Drive, Suite 102
Charlotte, NC 28262
Phone: 704-371-4333
Text Phone: 704-877-0749
Fax: 704-371-3015
E-mail: emorylawecf@gmail.com

*Attorneys for Plaintiffs,*
*Christopher Orlando and Yessenia Star Acosta*

</div>